392 F.Supp. 130 (1975)
SIERRA CLUB, a corporation, et al., Plaintiffs,
v.
Robert F. FROEHLKE, Secretary of the Army, et al., Defendants.
No. 72 C 584(3).
United States District Court, E. D. Missouri, E. D.
March 19, 1975.
*131 *132 *133 Alan C. Kohn, Kohn, Shands, Elbert, Gianoulakis & Giljum, St. Louis, Mo., for plaintiffs.
Donald J. Stohr, U. S. Atty., for defendants.
John W. Howald, Hillsboro, Mo., for amicus curiae.

MEMORANDUM
WANGELIN, District Judge.
This action is before the Court for a decision on the merits following the trial to the Court sitting without a jury.
This action brought by the plaintiffs, Sierra Club, a corporation, Clark Springer, Kathyrn Springer, Howard O. Patten and Olga Smith, (herein plaintiffs) seeking a declaratory judgment and injunctive relief against the defendants, Robert F. Froehlke, Frederick J. Clarke and Guy E. Jester, in regard to the Meramec Park Dam and any other dams planned in the Meramec Basin. The Meramec Basin Association was granted amicus curiae status on July 11, 1973.
The Court being fully apprised of the premises hereby makes the following findings of fact and conclusions of law.

Findings of Fact
1. This Court has jurisdiction over the parties and the subject matter hereto pursuant to 42 U.S.C. § 4321 et seq.; 5 U.S.C. § 702; and 28 U.S.C. §§ 1331(a), 1332, 1337, 1361, 2201 and 2202. Venue in this case is pursuant to 28 U.S.C. § 1391(e).
2. The plaintiff, Sierra Club, is a non-profit corporation organized and existing under the laws of California. Its principal offices are located in San Francisco, *134 California. It has 140,000 members organized into 42 chapters throughout the United States. It has an interest in the preservation, conservation, and proper management of national resources. Its Ozark chapter is located in Missouri and Arkansas, with its headquarters in St. Louis, Missouri.
3. The Ozark chapter has offical chapter outings for floating, fishing, canoeing, swimming, hiking, climbing, camping, exploring and other recreational pursuits and educational and scientific studies in the Meramec Basin area. The chapter and its members are using, and will continue to use, the area for recreational, educational and scientific purposes, and claim that such use will be vitally affected and injured by the construction of the Meramec Park Lake Project.
4. Plaintiff, Howard O. Patten, owns land at the juncture of the Huzzah and Meramec Rivers above the site for the proposed Meramec Park Dam. His land is slated to be purchased or condemned by the defendants for the purpose of the construction and operation of Meramec Park Lake. He derives recreational benefit from the Meramec and Huzzah Rivers in their present and natural state and desires that the Project not be built.
5. Plaintiff, Olga Smith, owns land on the Meramec River below the site for the Meramec Park Lake Dam. There is no congressional authorization for the construction of an impoundment in the vicinity of her property and it will not be taken for the purposes of construction and operation of Meramec Park Lake or any other project presently authorized by Congress.
6. Plaintiff, Clark Springer, owns land that may be affected by the construction of the Meramec Park Lake. He raises hogs and other livestock on these premises and desires that the Meramec Park Lake Project not be built.
7. Defendant, Robert F. Froehlke, was Secretary of the Army of the United States and an officer of the United States at the time this action was filed. As such, he exercised administrative supervision over the entire Department of the Army including the Corps of Engineers, its officers, agents and employees.
8. Defendant, Lt. Gen. Frederick J. Clarke, was Chief of Engineers, U.S. Army Corps of Engineers, and was an officer of the United States at the time this action was filed. As such, he exercised administrative supervision over the Army Corps of Engineers, its officers, agents and employees.
9. Defendant, Colonel Guy E. Jester, was District Engineer of the United States Army Engineer District, St. Louis, Missouri, in charge of and responsible for the Meramec Park Lake Project, and was an officer of the United States at the time this action was filed. As such, he exercised jurisdiction over the United States Army Engineer District, St. Louis, Missouri, its agents and employees.
10. The amount in controversy, exclusive of interest and costs, exceeds $10,000.
11. The Meramec Basin encompasses a watershed of approximately 3,980 square miles and is generally located in an area running Southwest from St. Louis for approximately 120 miles. At the present, no major dam or reservoir exists on the Meramec River or its principal tributaries. The river system is distinctive in that it is adjacent to and in part runs through a major metropolitan area and, in part, through a more rural and rustic setting.
12. The Meramec Park Lake of the proposed Project will be formed by the construction of an earth and rock filled dam which will have a crest length of approximately 3,000 feet and a top width of 30 feet. The lake will extend at normal pool 33 miles upstream on the main stem of the Meramec River and approximately 6 and 4 miles respectively, on the Huzzah and Courtois creeks. The impoundment will have a surface area of 12,600 acres at normal pool, at an elevation of 675 feet above sea level, and 23,000 acres at the top of the flood *135 control pool at a mean elevation of 709 feet above sea level.
13. The Meramec Park Lake Project is currently under construction by private contractors pursuant to contracts with the Corps of Engineers. The construction of an administrative building, an overlook, and an access road to the dam site are presently under way and are approximately 90% complete.
14. The Meramec Park Reservoir was first authorized by the Flood Control Act of 1938. Congress ratified it with modifications in the Flood Control Act of 1966. In addition, Congress ratified the Union Reservoir and first approved the Pine Ford, I-38, Irondale Reservoirs and 19 Angler Use Sites. Aside from the Meramec Reservoir, none of the other proposed reservoirs have been funded for land acquisition or construction. Only the Union Dam Project has received funds for planning.
15. Each of these reservoirs, if built, would supplement the others and in functioning together would provide the largest measure of flood protection, recreational, water supply and navigational benefits to the Meramec Basin.
16. The evidence produced at trial indicates that the reservoirs as discussed in findings of fact numbers 14 and 15 are functionally independent. It is clear that, while each reservoir has an incremental effect in meeting the total flood control and water quality needs of the Meramec River Basin, the proposed dams would operate independently of each other. It is clear that each reservoir, acting alone, would satisfy a portion of the river basin's needs. The evidence further shows that a determination of whether or not any of the other proposed reservoirs will ever be built would require speculation on the part of this Court.
17. The evidence adduced at trial indicates that the Meramec Basin can be divided into three sub-basins; the Meramec River, the Big River and the Bourbouse Sub-Basins. Each sub-basin has distinctive hydrologic, geographic, demographic, environmental, economic and sociological characteristics. Each sub-basin, therefore, becomes an appropriate unit for a separate environmental evaluation.
18. The Corps of Engineers prepared and filed an Environmental Impact Statement (EIS) which considers the Meramec River Sub-Basin and the Meramec Park Reservoir alone. There is no evidence in this matter which shows that this approach was either arbitrary or unreasonable, nor that it in any way attempts to avoid the full disclosure requirements of the National Environmental Policy Act of 1969 (NEPA). Considering that the construction of the other reservoirs is still a matter for speculation, it is obvious that the Corps of Engineers had no other choice for its preparation of the EIS.
19. In addition to the original EIS which was filed by the Corps of Engineers with the Council on Environmental Quality, a revised EIS was later filed which contains a discussion of the alternatives to the Meramec Park Reservoir. The alternatives discussed range from abandonment of the Project to various combinations of structural and non-structural measures. One of the alternatives considered was the evacuation of the Meramec River flood plain to prevent flood damage. It is noted that numerous recipients of the Impact Statement commented on the Corps' discussion of alternatives, particularly the flood plain evacuation alternative. As required, the Corps included those comments in the EIS and responded to each of them. It is significant that the plaintiff, Sierra Club, although given the opportunity, refused to comment on the EIS.
20. It is apparent that the discussion of alternatives, particularly non-structural alternatives such as flood plain evacuation, adequately disclose the requisite environmental information required, both as to the decision makers and the general public. The discussions are written in non-technical language with the lay-reader rather than an environmental planning expert in mind, but *136 the discussion is sufficiently detailed to alert both the decision makers and the public to potential options concerning the Meramec River Basin. Certain of the alternatives discussed, including flood plain acquisition, are clearly matters beyond the control legislatively granted to the Corps. The Congress of the United States has directed the Corps to build a dam. Any changes would require additional legislative action. This consideration allied with the economic, political and social difficulties associated with flood plain acquisition in a semi-urban area such as the one at issue here, leads the Court to believe that it is an impractical and speculative alternative.
21. Subsequent to filing the final EIS, the Corps inventoried the land and structures on the flood plain of the Meramec River. This inventory, a standard Corps planning technique, resulted in a gross estimate of $143,713,667 for the cost of acquiring and evacuating the flood plain. This new inventory showed that the Corps had undervalued the flood plain in its discussion of alternatives in the final EIS. However, this type of continuing evaluation is precisely the type of agency action contemplated by Congress and the Council on Environmental Quality. It is readily apparent based upon the testimony and the exhibits presented at trial that the Corps of Engineers thoroughly considered the alternatives to the construction of the dam for this Project, including flood plain acquisition. Congress first authorized the Meramec Park Reservoir by the Flood Control Act of 1938. Between 1938 and 1966, the Corps of Engineers conducted various planning and design activities. In 1966, Congress ratified the previously authorized Meramec Park Reservoir Project with an additional project purpose, inter alia, of low flow augmentation for water quality control. From fiscal year, 1968, through fiscal year, 1972, Congress appropriated approximately $5.5 million for the Project. To date, Congress has appropriated approximately $18 million for the Project. Congress first authorized funds specifically earmarked for construction in August of 1973.
22. In October of 1972, Congress passed a 1972 Amendment to the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. Only sub-paragraphs (b) (1) and (b) (3) of § 1252 are pertinent to this lawsuit.
23. The Environmental Protection Agency (EPA) in November, 1973, circulated to its regional administrators and to the Corps of Engineers the following policy guide. In regard to 33 U. S.C. § 1252, it was stated:
"Determinations regarding water quality control storage in authorized projects will be limited to those projects for which funds to initiate construction, including land acquisition, had not been appropriated prior to passage of P.L. 92-500 [16 [33] U.S. C. § 1252]. Therefore, item 1, page 2 of attachment 1 is changed to read as follows: `Notwithstanding any previous recommendations concerning water quality storage made by EPA or its predecessor agencies, this policy shall be applied by EPA when reviewing and commenting upon reports and environmental statements during both the preauthorization and postauthorization planning phases of federal projects. Accordingly, EPA will apply Section 102(b) [B] and the implementing subject policy to those reservoir projects not funded by Congress for construction, including land acquisition, as of October 18, 1972  the effective date of the Act.'
"For projects in construction status, the Corps will give the same type of consideration to EPA's views on water quality storage that are occasioned by review of an environmental impact statement or other regular coordination procedures as it does the views of other agencies on matters within their expertise. Consideration given to EPA's views will be reflected in the Environmental Impact Statement or addressed in other appropriate ways."
24. The EPA commented on the draft Environmental Impact Statement. The *137 EPA regional administrator, acting pursuant to the then prevailing EPA policy, specifically disapproved any allocation of benefits for water quality control. The Corps of Engineers responded to this comment. The Corps then went beyond the statutorily required comment and included in the EIS a discussion of the Federal Water Pollution Control Act Amendments of 1972, and their effect on the Project, particularly on the benefit/cost ratios, as well as stating the Corps' position on the applicability of the Federal Water Pollution Control Act Amendments to the Meramec Park Reservoir. It is noted that this exchange of views between the Corps of Engineers and the Environmental Protection Agency took place prior to the policy change promulgated by the Environmental Protection Agency in November of 1973.
25. The Court finds that the benefit/cost ratio of the Meremec Park Reservoir is 1.9 to 1. The benefit/cost ratio of the flood control project purpose of the Meramec Park Reservoir considered alone is 1.5 to 1.
26. Congress has determined conclusively, in ratifying this Project in 1966 and in appropriating funds for thereafter, that the benefit/cost ratio of the Project as a whole and of each of the separable Project purposes as discussed in finding of fact number 14 is favorable within the meaning of the Flood Control Act of 1936, 33 U.S.C. § 701a.
27. Congress authorized the Meramec Park Reservoir and the Flood Control Act of 1938. In 1966, Congress passed the Flood Control Act of 1966. That Act incorporated by reference House Document No. 525 which is the Project document for the Meramec Basin Plan. The 1966 Act authorized a Project having an estimated cost of $45,971,000 and contained a proviso requiring Presidential approval of a report re-examining the cost sharing arrangements and the basis for Project formulation. Since 1966, Congress has annually appropriated funds for the planning, land acquisition and construction of the Meramec Park Reservoir.
28. An inspection of House Document No. 525 discloses that Congress intended to ratify the existing authorization of the Meramec Park Reservoir, and to authorize three new reservoirs, Pine Ford, Irondale and I-38 and 19 Angler Use Sites.
29. The 1966 Act specifically authorizes a Project costing $45,971,000. That figure is the sum of the total cost (rounded to the nearest $1,000) of Pine Ford ($26,400,000), Irondale ($12,900,000) and I-38 Reservoirs ($6,370,000) and the federal share of the cost of the 19 Angler Use Sites ($300,500).
30. The Corps of Engineers has not submitted a report to the President nor sought Presidential approval for the Meramec Park Reservoir, and has taken the position that the Flood Control Act of 1966 does not require a report to the President regarding Meramec Park Reservoir.
31. The Federal Water Project Recreation Act of 1965, 16 U.S.C. § 460l-12 et seq., requires that the various states share with the federal government the cost of recreational development of federal water projects. The Corps of Engineers has not requested the State of Missouri to furnish assurances of its intent to share the recreational costs of the Meramec Park Reservoir, although the Corps requested and received assurances with regard to cost sharing for water supply costs.
House Document No. 525 states as follows:
"Subsequent to submittal of the report to the Board for review, the Chief of Engineers in coordination with the Bureau of the Budget furnished guidelines for implementing the new recreation cost-sharing policy under Public Law 89-72 [Federal Water Project Recreation Act], in previously authorized civil works projects of the Corps of Engineers. Accordingly, for the Meramec Park and Union Projects which were funded for *138 preconstruction planning prior to fiscal year 1966, recreational development would be in accordance with the policy in effect prior to 19 February 1965, and no non-Federal cost-sharing for recreation would be required."
32. In accordance with a Fish and Wildlife Coordination Act, 16 U.S.C. § 662(b), The Fish and Wildlife Service Agency of the Department of the Interior prepared and submitted to the Corps of Engineers a report on fish and wildlife in the Project area. That report was included in House Document No. 525 and made a part of the Flood Control Act of 1966. Part of that report was also included in the Environmental Impact Statement. In the coordination of the Environmental Impact Statement, the Department of the Interior devoted 16 pages of comments to the impact of the Meramec Park Reservoir Project. Nowhere in that 16 pages did that Department indicate that the fish and wildlife report previously submitted was inadequate. Subsequent to the filing of this lawsuit, the Department of the Interior wrote to the Corps of Engineers and attempted to withdraw its report. The Department of the Interior did not make this request until all legislative and administrative decisions had been made with regards to the Meramec Park Project. It must also be noted that the Department of the Interior has not withdrawn that report from Congressional consideration.
33. During the Winter months certain caves in the Reservoir area are inhabited by the Indiana Bat (Myotis sodalis).
34. The Indiana Bat is presently listed on the Endangered Species Act of 1973.
35. The voluminous expert testimony produced at trial concerning the Indiana Bat leads this Court to the conclusion that the evidence fails to show that any of the defendants present activities in constructing the Meramec Park Reservoir are adversely affecting Indiana Bats in the Project area.
36. The evidence is inconclusive in determining whether or not the closure of the proposed dam in 1980 or 1981 will have an adverse effect on the Indiana Bats if any of them are hibernating in any of the caves below the normal pool elevation of the Reservoir.
37. The Environmental Impact Statement for this Project discusses the effect of the proposed Project on the Indiana Bat.
38. The Corps of Engineers has been, and is, making all possible reasonable good faith efforts to comply with the provisions of the Endangered Species Act of 1973.
39. The Corps has prepared and filed with the Council of Environmental Quality a voluminous Environmental Impact Statement on the Meramec Park Reservoir. Included in the Environmental Impact Statement is a statement of findings outlining the Corps' reasons for deciding to proceed with the Project.

Conclusions of Law
In this action challenging the construction of the Meramec Park Reservoir, the plaintiffs have set forth seven major issues for this Court to rule upon. The issues are as follows:
1. The scope of the Environmental Impact Statement.
A. The adequacy of discussion of possible alternatives to the construction of the dam.
B. The completeness of the Environmental Impact Statement.
2. The benefit/cost ratio of the Project.
3. The application of the Federal Water Pollution Control Act of 1972 to the Project.
4. The necessity for Presidential approval of the Project.
5. The necessity for cost/sharing assurances from the State of Missouri.
6. The arbitrary and capricious decision of the defendants to proceed with the Project.

*139 7. The application of the Endangered Species Act of 1973 to the Project.
It is plaintiff's contention that the Corps of Engineers has violated the National Environmental Policy Act, 42 U. S.C. § 4331 et seq. on the grounds that the Corps prepared and filed an Environmental Impact Statement which considers only the Environmental Impact of the Meramec Park Reservoir rather than the entire Basin Project approved in the Flood Control Act of 1966.
The evidence clearly shows that only the Meramec Park Reservoir has been regularly funded by Congressional appropriation. Only the Union Reservoir has received funds for planning alone. The remaining reservoirs approved in the Flood Control Act of 1966 are clearly subject to the determination of Congress as to when they should be constructed, if ever. The conditions of restudy and Presidential approval of the Pine Ford, Irondale and I-38 Reservoirs are a clear indication of the Congressional intention that the Meramec Park Reservoir was not to be a part of a functionally interdependent system of reservoirs.
The evidence at trial clearly indicated that the Meramec Park Dam will provide a certain level of flood protection, recreational opportunity, and storage for water supply. Irregardless of future Congressional or State action regarding the other Reservoirs, it will always provide these benefits. The addition of other reservoirs will not multiply the benefits of the Meramec Park Dam. The overall benefits to the Meramec Park River Basin will increase, but Meramec Park Reservoir benefits will remain at a constant level, satisfying only its proportionate share of over-all basin needs.
In a situation such as the one presently at bar non-interdependent projects do not require a comprehensive Environmental Impact Statement which cover all possible construction plans. Sierra Club v. Callaway, 499 F.2d 982 (5th Cir., 1974); and Trout Unlimited v. Morton, 509 F.2d 1276 (9th Cir., 1974).
The factual situation in the present case is not, as plaintiff contends, similar to that found in Named Individual Members of the San Antonio Conservation Society v. Texas Highway Commission, 446 F.2d 1013 (5th Cir., 1971).
Named Individual Members, supra, involved a suit against the Texas Highway Commission and the Department of Transportation over the proposed construction of an Interstate Highway through a park in the City of San Antonio. The defendants there prepared a plan which considered in a fragmented way the Environmental Impact of the entire highway plan. The factual distinction between that case and the proposed dam in this case is obvious.
This Court is of the opinion that the Meramec Park Reservoir has the requisite independent utility to be the appropriate construction covered by the Environmental Impact Statement filed by the defendants. Indian Lookout Alliance v. Volpe, 484 F.2d 11, 20 (8th Cir., 1973).
At the present time, it is this Court's opinion that the Meramec Park Reservoir is sufficiently definite to permit environmental evaluation. Sierra Club, supra, 499 F.2d at (l. c.) 991.
This Court is in agreement with District Judge Renfrew of the United States District Court for the Northern District of California that:
. . . so long as each major federal action is undertaken individually and not as an indivisible, integral part of an integrated state wide system then the requirements of NEPA are determined on an individual major federal action basis. Plaintiffs' suggestion that there is need for a comprehensive study . . . should be made to the Congress and not to the Court. Environmental Defense Fund, Inc. v. Armstrong, 356 F.Supp. 131, 139 (N.D. Cal., 1973); aff'd 487 F.2d 814 (9th Cir., 1973).
*140 Plaintiffs also contend that the Corps of Engineers has failed to adequately state the alternatives to the Meramec Park Reservoir and its Environmental Impact Statement. The Corps' presentation of the alternative of flood plain acquisition, a method of flood damage reduction characterized by evacuation of the flood prone areas, is specifically attacked.
The revised EIS which contains a discussion of the alternatives to the Meramec Park Reservoir was prepared and filed by the Corps with the Council on Environmental Quality. The alternatives discussed by the Corps range from abandonment of the Project totally, to combinations of structural and non-structural measures. The Corps specifically discussed the alternative of evacuating the flood plain to reduce flood damage. The EIS in draft form was circulated by the Corps to interested agencies and parties. Several of those parties commented on the discussion of alternatives, particularly the flood plain evacuation alternative. As required by the EPA, the Corps included the comments in the EIS and responded to each of them. It must be noted that plaintiffs' expert witness, Mr. Neil Porterfield, a St. Louis land planner, presented evidence concerning the alternative of flood plain zoning to the Meramec Park Reservoir, also discussed the same alternatives before the House Appropriations Committee. In that same year, fiscal year, 1974, the Congress appropriated construction money for the Meramec Park Reservoir.
As the evidence at trial showed, the flood plain acquisition was not a reasonable alternative to the proposed dam because of (A) the $143 million cost; (B) the removal of private land from the tax base of the counties involved; (c) the dislocation of urban areas; (d) political opposition; and most importantly (E) the acquisition of the flood plain would not satisfy the Congressional requirements for recreation, water supply, and low flow augmentation. It is also of great importance that no legal framework exists in the majority of the counties or municipal corporations that would be involved to regulate the flood plain areas.
The defendants have clearly complied with the test of good faith objectivity with regards to Environmental Impact Statements. Environmental Defense Fund v. Corps of Eng. U.S. Army, 470 F.2d 289 (8th Cir., 1972). The Impact Statement has listed the alternatives to the proposed Project, and also included the results of the Corps' own investigation and evaluation of alternatives so that the reasons for the choice of action are clear. Environmental Defense Fund v. Froehlke, 473 F.2d 346, 350 (8th Cir., 1972). To require the defendants to discuss more would be an excursion into the realm of de minimus.
Plaintiffs' complaint also challenges the Environmental Impact Statement on the basis of inadequacy, due to the fact that it contains no report pursuant to the Fish and Wildlife Coordination Act, 16 U.S.C. § 662(b).
Pursuant to the Fish and Wildlife Coordination Act, supra, the Department of the Interior in 1964 prepared and submitted to the Corps of Engineers a report. That report was included in House Document No. 525 and, by reference, made a part of the Flood Control Act of 1966, supra. That report was also included, in part, in the Environmental Impact Statement. The Department of the Interior wrote 16 pages of comments on this Reservoir Project, including comments on the fish and wildlife aspects thereof, to coordinate with the Environmental Impact Statement. In no way was the previously submitted report indicated to be inadequate. Thereafter, relying at least in part on the Department of the Interior's report, both Congress and the Corps of Engineers made a decision to proceed with this Reservoir Project.
On June 14, 1974, and on two occasions thereafter, the Department of the Interior wrote the Corps of Engineers and attempted to withdraw its report. *141 The Departmnt of the Interior made no effort to withdraw that report from Congressional consideration.
It is significant that the supposed inadequacies in the original report were not made known until all Congressional and administrative action on this Project had been completed. The Court is of the opinion that the Environmental Impact Statement as filed concerning this Project is comprehensive and complete including a full and thorough discussion of the fish and wildlife impacts of the Project.
Since the Corps has, in the opinion of this Court, made a good faith compliance with the National Environmental Protection Act, the factors to be considered under the Fish and Wildlife Act have been automatically taken into consideration. Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d at 356.
Plaintiff also contends tht the proposed Reservoir is a violation of the Flood Control Act of 1936, 33 U.S.C. § 701a. It is plaintiffs' contention that, if flood plain acquisition costs are substituted for the proposed Project costs for flood control and computed according to the "separable cost/remaining benefits" method, then the benefit/cost ratio for flood control for this Project falls below a ratio of 1 to 1. This, the plaintiffs assert, is a violation of the afore-cited Act, because the separable Project costs for flood control would then exceed the costs of a less expensive alternative, namely, flood plain acquisition.
The Court finds plaintiffs' evidence concerning this contention simply not credible. It must be noted that plaintiffs' expert witness concerning the benefit/cost ratio admitted on cross-examination that his analysis was based on the benefits and costs of a three-dam system rather than the Meramec Park Reservoir alone. The other parts of plaintiffs' witnesses' testimony were shown to be inadequately prepared and calculated.
Congress considered the benefit/cost ratio in providing for the appropriation for this Project. The recent case law environmental law is replete with examples that the Courts will not substitute their judgment for that of the Congress. No evidence has been presented which would lead this Court to stray from that path. Environmental Defense Fund v. Corps of Eng. of U.S. Army, 325 F.Supp. 728, 740 (E.D.Ark., 1971).
Plaintiff also complains that the interest rate of 3 1/8 % in computing costs on this Project is unrealistically low. This interest rate was established by the Congress, and it alone has the authority to change it. Warm Springs Dam Task Force v. Gribble, 378 F.Supp. 240, 246 (N.D.Cal., 1974).
Plaintiffs' attack on the Project as a violation of the Federal Water Pollution Control Act Amendments of 1972, codified at 33 U.S.C. §§ 1252 (b) (1) and 1252(b) (3) is based on the fact that the Corps of Engineers rather than the administrator of the Environmental Protection Agency has made a determination of the need for water storage in the Meramec Park Reservoir for water quality control. In its presentation to Congress in 1966, the Corps allocated a portion of the reservoir capacity for low flow augmentation. This was in accordance with the then applicable Pollution Control Act, 33 U.S.C. § 1153(b) (1), (2), (3), (4).
In 1966 Congress ratified and approved the Meramec Park Reservoir as recommended by the Corps. Funds were appropriated through fiscal year, 1974, for land acquisition and construction in the amount of approximately $14 million. Subsequent to the fiscal year, 1973, appropriation for this Project, Congress passed a 1972 amendment to the Federal Water Pollution Control Act, supra. The plain language of the statute indicates that it is applicable only to projects which are in the planning or preauthorization stages. It is significant that the two agencies responsible for the implementation of the Federal Water Pollution Control Act Amendments *142 of 1972 interpret the statute in the manner so stated as shown by exhibit G introduced at trial. The case of Cape Henry Bird Club v. Laird, 484 F. 2d 453 (4th Cir., 1973) is dispositive of this issue. Plaintiff has failed to show any violation of the Federal Water Pollution Control Act.
It is plaintiffs' contention that the Flood Control Act of 1966, P.L. 89-789 requires the approval of the President of a report prepared by the Secretary re-examining the basis on which the Meramec Basin Plan was formulated and the related arrangements for cost sharing.
The Meramec Park Reservoir was authorized by Congress in the Flood Control Act of 1938, P.L. 75-761. The Flood Control Act of 1966 incorporated by reference House Document No. 525 which is a project document for the Meramec Basin Plan. That 1966 Act authorized a Project having an estimated cost of $45,971,000 and contained a proviso requiring Presidential approval of a report re-examining the cost sharing arrangements on the basis for project formulation. Since 1966 the Congress has annually appropriated funds for the planning, land acquisition and construction of the Meramec Park Reservoir.
A reading of House Document No. 525 discloses that the Congress intended to ratify the existing authorization of the Meramec Park Reservoir and to authorize three new Reservoirs, Pine Ford, Irondale and I-38, and 19 Angler Use Sites. A Project costing $45,971,000 is specifically authorized by the 1966 Act. The sum of the total cost of the Project (rounded to the nearest $1,000) is the aforementioned figure.
The evidence presented at trial is clear that Congress did not intend that the proviso in the Flood Control Act of 1966 apply to the Meramec Park Reservoir. The 1966 Act merely ratified with certain modifications the Project previously authorized by the Flood Control Act of 1938. It is clear that the 1966 Act refers only to the three newly authorized Reservoirs and the 19 Angler Use Sites. It is significant that Congress has annually appropriated money for the planning, land acquisition and construction of the Meramec Park Reservoir without requiring Presidential approval or the report mentioned in the 1966 Act.
Even if a report was required, it is the responsibility of Congress to determine whether or not a particular project is proceeding in accordance with its authorization. Environmental Defense Fund v. Corps of Eng., 470 F.2d 289 (8th Cir., 1972).
Plaintiffs' contention that the defendants are illegally constructing the Meramec Park Reservoir because they have not requested and received assurances from the State of Missouri that it will share the cost of recreational development as required by the Federal Water Project Recreation Act of 1965, 16 U.S.C. § 460l-12 et seq. is simply not credible.
A reading of the aforecited statutory section shows that projects such as the Meramec Park Reservoir, which were previously authorized are clearly not covered by the Federal Water Project Recreation Act of 1965. House Document No. 525 as adopted by Congress in the Flood Control Act of 1966 is further evidence of the interpretation of the Federal Water Project Recreation Act. The statutory language clearly shows that the Meramec Park Reservoir is exempt from such requirements of state cost/sharing assurances.
Plaintiff also contends that the Corps of Engineers' decision to proceed with this Project was arbitrary, capricious and an abuse of discretion.
The scope of review of such administrative decisions has been set forth by the Eighth Circuit Court of Appeals in Environmental Defense Fund v. Corps of Eng. U.S. Army, 470 F.2d 289 (8th Cir., 1972). This Court must first determine whether the Corps acted within the scope of its authority and then *143 whether the decision reached was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. In making such a determination, this Court must decide if the agency failed to consider all relevant factors in reaching its decision, or if the decision itself represented a clear error in judgment. Since the NEPA is involved in this case, this Court must also determine if the Corps reached its decision after a full, good faith consideration and balancing of the various environmental factors. Then, according to the standards set forth in §§ 101(b) and 102(1) of the NEPA, the Court must determine whether the actual balance of costs and benefits as given was arbitrary, or clearly gave insufficient weight to environmental values. It must also be noted that this Court is not empowered to substitute its judgment for that of the Agency. Environmental Defense Fund v. Corps of Eng., supra, at 300.
With the aforementioned standard of review in mind this Court is of the opinion that the Corps of Engineers has clearly complied with the requirements of the NEPA. It is readily apparent that the Corps acted in good faith, within its authority, and in a reasonable, responsible manner. The sheer volume of the Environmental Impact Statement and other related documents prepared by the Corps would justify this Court's opinion. A careful and close reading of the documents makes the conclusion inescapable that the Corps was not capricious or arbitrary in continuing with the Project. It must also be considered that this Project has been specifically authorized twice by Congress, and that since 1968 the Congress has annually appropriated funds for it.
Plaintiffs also attack the construction of the Meramec Park Reservoir on the grounds that the Corps of Engineers has violated § 7 of the Endangered Species Act of 1973, 16 U.S.C. § 1536, by refusing to take the action necessary to insure that the construction of the Meramec Park Reservoir does not jeopardize a continued existence of the Indiana Bat, and does not modify or destroy its habitat. Related to this issue is plaintiffs' allegation that the Environmental Impact Statement does not adequately discuss the Indiana Bat.
Before this Court discusses the legal ramifications of the ultimate issue concerning the Indiana Bat, certain factual and jurisdictional questions must be considered.
On September 20, 1974, plaintiffs amended their complaint to allege a violation of the Endangered Species Act, supra. This was only ten days prior to the trial setting of September 30, 1974. At that time this Court vacated the setting and reset the matter for November 25, 1974. Prior to trial defendants filed a motion to dismiss the Endangered Species Act allegations. The motion alleged that plaintiffs failed to plead the requisite notice requirements of the Endangered Species Act, 16 U.S.C. § 1540(g)(2)(A). As grounds for denying relief under the Endangered Species Act on a jurisdictional basis defendants cite City of Highland Park v. Train, 374 F.Supp. 758 (N.D.Ill., 1974). That case, while not involving the same exact statute, is persuasive on its face. However, considering the fact that there are only five or six experts in the study of Myotine Bats in the world and that the habits, biology and other characteristics of the bats were fully developed at the trial, this Court feels that a dismissal of plaintiffs' claim for failure to comply with the time limit stated in the statute would work an injustice to the adjudication of plaintiffs' claim. To allow defendants to further prepare for trial, in the opinion of this Court, would produce no added evidence which would help this Court in its decision.
Parallel to this jurisdictional problem raised by the time limit in the Endangered Species Act is the legal doctrine of primary jurisdiction. Normally in a factual situation similar to the present case at bar this Court would postpone its action on the case before it, until after the appropriate administrative agency had made a designated determination. *144 Davis, Administrative Law Treatise, Vol. 3 § 1901. The principal reason for awaiting an agency determination is that the Court should not act upon a subject matter that is particularly within an agency specialized field without taking into account what the agency has to offer. Far East Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1951).
As previously stated there are few Myotine Bat experts in the world. Dr. Richard F. Meyers was called as plaintiffs' expert witness on the Indiana Bat. At trial, Dr. Meyers testified at great length concerning the Indiana Bat. This court accepts him as an expert in the area of bat zoology and regards him as one of the previously mentioned experts on Myotine Bats. This Court is confident that if it remanded the Endangered Species question concerning the Indiana Bat to the appropriate agency that no new information or evidence would come to light due to the small number of experts on the Indiana Bat. The Court is not attempting to substitute its judgment for that of the agency, but is merely moving on the well reasoned assumption that a decision to remand to the appropriate agency for a determination would lead to a repeat presentation to the agency of the evidence developed at trial. This avoiding of repetition is within the framework of the law as stated in Far East Conference, supra.
The evidence at trial further showed that the activities of the defendants in constructing the Meramec Park Reservoir have not up until the present time shown any indication of harassing or endangering the Indiana Bat. The evidence also showed that when the Meramec Park Reservoir reaches its normal pool level that no caves that are presently inhabited by Indiana Bats will be affected. It is significant to this Court that Dr. Meyers stated that even if the Meramec Park Reservoir were not built, the Indiana Bats would probably become extinct within fifteen to twenty years.
The Impact Statement filed by the defendants adequately discusses the Indiana Bat.
Considering the paucity of actual knowledge about the Indiana Bat and the small number of experts acquainted with the species, it is this Court's opinion as the reviewing body, using the standard of review propounded by the Eighth Circuit Court of Appeals that the defendants have not violated the Endangered Species Act of 1973, nor is the Environmental Impact Statement lacking in discussion of the effect on the Indiana Bat.
In conclusion, this Court is of the opinion that it can have no other holding, but to enter judgment for the defendants. In every instance of alleged statutory violation, or other alleged failings of the defendants with regards to the Meramec Park Reservoir, the defendants have carried the burden of proof or have indicated to this Court's satisfaction that no violation has occurred.
Congress has continuously funded the Meramec Park Reservoir for a number of years through various flood control acts. This Court will not substitute its judgment for that of the elected representatives of the United States. As Alexander Hamilton stated in Federalist, No. 78:
The Courts must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body [Emphasis in original].
The plaintiffs have produced no evidence to this Court which would lead the Court to substitute its will to that of Congress. Accordingly, judgment will be entered for the defendants.