**SIERRA CLUB, et al.**

v.

**Robert F. FROEHLKE, et al.**

**Civ. A. No. 71–H–983.**

United States District Court,
S.D. Texas,
Houston Division.

March 25, 1986.
As Amended March 27, 1986.

Rayburn Berry, Houston, Tex., for plaintiffs.

Frances Stacy, Asst. U.S. Atty., Houston, Tex., for Defendants.

Warren G. Clark, Jr., Anahuac, Tex., for intervenor Chambers-Liberty.

James H. Keahey, Austin, Tex., for intervenor Trinity River.

Charles L. Berry, Sharon Mattox, Richard Milvenan, Vinson & Elkins, First City Tower, Houston, Tex., for intervenor City of Houston.

### INDEX

| | | Page |
|---|---|---|
| I | BACKGROUND OF THE LITIGATION | 1217 |
| II | FACTUAL OVERVIEW AND COURT RATIONALE FOR DENYING DEFENDANTS' PRAYER FOR RELIEF | 1218 |
| III | THE CONTENTIONS OF THE CORPS | 1220 |
| | A. Corps Actions to 1983— Congressional Action 1983 | 1221 |
| | B. Corps Actions 1983–1985 | 1221 |
| | C. Congressional Action 1985 | 1222 |
| IV | FUNCTION OF THE MULTIPLE ACTORS | 1222 |
| | A. Court Role—Standard of Review | 1222 |
| | B. Agency Role | 1224 |
| | C. Congressional Role | 1224 |
| V | REVIEW OF THE CORPS NEPA PROCEDURE | 1225 |
| VI | CORPS LACK OF GOOD FAITH | 1227 |
| VII | CONGRESSIONAL ACTION 1983 VS. 1985 | 1231 |
| VIII | CONCLUSION | 1233 |

---

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

Before the Court are the Federal Defendants' Motion for Dissolution or Modification of Injunction Under Rule 60(b)(5) FRCP and For Dismissal, and Intervenors Trinity River Authority of Texas, City of Houston, and Chambers-Liberty Counties Navigation District's Motion to Dissolve Injunction wherein all parties are seeking termination or alteration of the injunction of 1973. The Court held a hearing to determine the sufficiency of Defendants' motions, the first segment of 3 days commencing on August 27, 1985 and the concluding portion of 5 days commencing on November 19, 1985. *See Sierra Club v. United States Army Corps of Engineers*, 609 F.Supp. 1052 (S.D.N.Y.1985). After careful consideration of the relevant law, the memoranda of all parties, the administrative record, as well as the unusual and complex factual and procedural background surrounding this protracted litigation, the Court is of the opinion that the request by the Defendants and Intervenors should be denied, and that the injunction imposed in 1973 should remain in force until full compliance with the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* has been effectuated.

## I.

## BACKGROUND OF THE LITIGATION

The purposes of the initial authorization by Congress in 1962 to construct the Wal-

lisville project were for salinity control, water supply, fish and wildlife enhancement, navigation, and recreation. Thereafter, in 1966 the Corps of Engineers (hereinafter referred to as the Corps) began construction.[1] Subsequently, Congress passed NEPA [2] which was to apply retroactively to projects under construction. *Sierra Club v. Callaway*, 499 F.2d 982, 988 (5th Cir. 1974) (hereinafter referred to as *Wallisville I*). As a result, the Corps sought to comply and circulated a DEIS in 1970.[3] However, before a FEIS could be drafted, Plaintiffs filed the lawsuit in *Wallisville I* seeking to enjoin further construction of the Wallisville project due to claimed NEPA violations. After an extensive hearing and a careful examination of the paucity of law interpreting NEPA at that time, as well as an extensive review of the legislative history of the statute, this Court granted the Plaintiffs' request for an injunction, holding that the EIS was insufficient. *See Sierra Club v. Froehlke*, 359 F.Supp. 1289 (S.D.Tex.1973), *rev'd and remanded*, 499 F.2d 982 (5th Cir.1974).[4]

The Fifth Circuit reversed certain portions of this Court's ruling but left the injunction intact pending submission of a SEIS on the issues determined inadequate in the original EIS. 499 F.2d at 994.

Moreover, the Circuit Court stated that "the Corps need not submit a new impact statement on the Wallisville project, but will submit a revised or supplemental statement. The sufficiency of such statement ... will ... be ... considered on its own merits." *Id.* "The statement will be adjudged anew on the basis of its compliance with Sec. 102 tested by its 'good faith objectivity rather than subjective impartiality, ...'" *Id., quoting Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army*, 470 F.2d 289, 296 (8th Cir.), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1972). Moreover, "[o]n another trial plaintiffs will have the burden of establishing their claims by a preponderance of the evidence ..." 499 F.2d at 992. Thereafter, the Corps filed a combined draft EIS–PACR in July, 1979 with the EPA which was circulated to the agencies and individuals.[5]

## II.

## FACTUAL OVERVIEW AND COURT RATIONALE FOR DENYING DEFENDANTS' PRAYER FOR RELIEF

In the proposed findings of fact and conclusions of law submitted by all Defendants, conclusion of law 22 reads as follows:

> SEIS—Supplemental Environmental Impact Statement
> SIPACR—Supplemental Information to the Post-Authorization Change Report
> SIR—Supplemental Information Report
> ROD—Record of Decision
> SOF—Statement of Findings

1. Vol. 1, pg. 23; Vol. 2, pg. 336; Vol. 3, pg. 898. All references hereinafter are to the administrative record.

2. For a quickhand reference to the chronological sequence of events, see Exhibit "A." Moreover, for purposes of this opinion, the following abbreviations will be used:
 NEPA—National Environmental Policy Act
 CEQ—Council on Environmental Quality
 BERH—Board of Engineers for Rivers and Harbors
 OCE—Office of Chief of Engineers
 EPA—Environmental Protection Agency
 USFWS—United States Fish & Wildlife Service
 NMFS—National Marine Fisheries Service
 FWCA—Fish and Wildlife Coordination Act
 WRC—Water Resources Council
 EIS—Environmental Impact Statement
 PACR—Post-Authorization Change Report
 FEIS—Final Environmental Impact Statement
 DEIS—Draft Environmental Impact Statement

3. Vol. 2, pg. 336; Vol. 2, pg. 334.

4. *Id.;* Vol. 3, pg. 898.

5. Vol. 2, pg. 338. There is a dispute as to whether the project is modified or new, and whether the statement is revised or supplemental. General Dacey testified that the project was modified. *See* Vol. 1, pg. 23. Further, the Corps submits that the EIS–PACR is new, as opposed to a revised or supplemental statement which would have been condoned by the Circuit had it passed NEPA scrutiny. In any event, whatever label is given the EIS–PACR filed, as directed by the Circuit, this Court will adjudge it anew.

Congress is entitled to legislate on any basis that it desires, and a federal court may not invalidate legislation because it believes Congress acted on erroneous data.

This is a highly unusual case involving NEPA which acquires significance in a number of ways, one of which is the manner in which standard NEPA procedures were not followed by the Corps or the Congress. Although Defendants vigorously contend that their conduct, while admittedly somewhat irregular, meets the required level of statutory procedural integrity to satisfy any judicial review, the Plaintiffs assert otherwise. They view the above proposed conclusion of law as completely inapplicable to NEPA, a Congressional statute enacted into law in 1969. Instead, it is argued that when Congress passes a law, the Corps and the Congress must abide by it and not subvert its purpose or spirit relevant to environmental concerns. This overview examines the series of events, the legal arguments, and the Court's decision. The balance of the opinion is a section by section analysis of the critical legal issues involved.

When the first of two hearings commenced pursuant to Federal Defendants' Motion for Dissolution or Modification of Injunction, this Court fully anticipated that the evidence would focus primarily on issues concerning whether or not the Corps' EIS–PACR could pass a substantive NEPA review. The Fifth Circuit Court of Appeals had reversed certain portions of this Court's ruling, but left the injunction in place pending submission of a SEIS on the issues found to be inadequate in the original EIS. More specifically, the appellate court felt that a revised or supplemental impact statement would suffice. Corps compliance with NEPA would be tested by good faith objectivity among other legal criteria, and this Court would simply review the evidence to ensure Corps' compliance with all aspects of a NEPA review, including procedural integrity of the agency's consideration of environmental factors addressed in the SEIS.

Pursuant to such mandate the Corps filed a combined draft EIS–PACR in July, 1979, and in accordance with their own internal regulations which were implemented to effectuate NEPA, circulated the document to agencies and individuals for comment. After digesting the comments solicited, the Corps modified the EIS–PACR and forwarded it to the Division Engineer of the Southwestern Division where the conclusions and recommendations were approved. The next step was transmittal of the EIS–PACR to BERH which in March, 1982 forwarded the proposal to OCE. Here certain policy decisions were to be considered. If the original project authorized by the Congress and the newly modified plan were essentially the same, the Chief of Engineers had the authority to reauthorize the project without obtaining Congressional approval again. Here the EIS–PACR languished for a year without approval. In order to aid the Chief of Engineers in determining the scope of his discretionary authority with respect to this project, the OCE requested the Corps to prepare a SIPACR, that is, a document containing supplemental information to the EIS–PACR.

It is at this point that matters became murky, and a departure from normal NEPA procedures occurred. After the SIPACR was prepared by the Corps in July, 1982, it was not sent back for full agency review and comments, and considerable time elapsed. In March 1983, OCE received a legal opinion from its own counsel that it would be improper for the Chief of Engineers to exercise his discretion and approve the modified project because the SIPACR was new and substantially different from the EIS–PACR.

Meanwhile, Congress had become restless during the delay. Concurrently with the Corps' preparation of the SIPACR in July 1982, the local sponsors of Wallisville were pressuring a prominent local Congressman to obtain approval of the project. Also in March 1983, at about the time the OCE received a legal opinion from its counsel advising against administrative approv-

al of the project, the Congressman was requesting the Energy and Water Subcommittee to include some clarifying language in the 1983 supplemental appropriations bill on the project. In July 1983, Congress passed the bill which contained language referencing and relying upon SIPACR which had never been subject to the NEPA administrative review process in any manner, and the EIS–PACR which remained stalled and only partially processed at the OCE administrative level.

Returning once more to the Corps, it is openly conceded that the SIPACR was never processed pursuant to NEPA requirements. Instead, the Corps has taken the position that SIPACR was an internal document which was for in-house use only, and not subject to the NEPA review. From a review of the record, however, the Court finds otherwise. When asked how the SIPACR made its way to Congress where it was specifically referenced in the supplemental appropriations legislation, the Corps had no answer. It was a mystery. The Corps represented that it had never anticipated such premature actions by the Congress. The record clearly refutes this position of the Corps and undercuts any contention of its good faith and ignorance of events occurring in Congress. However, faced with an unprecedented accomplished fact—the passage of the supplemental appropriations bill before completion of the NEPA processing—the Corps hastened to conform its administrative actions to the legislation. In relatively short order, a period of some seven months, the SIPACR and EIS–PACR were administratively processed, and the SIR and ROD issued by the end of February 1984.

Congress again took action to appropriate project funds in November 1985. Both the House and Senate Committees on Energy and Water Development utilized similar language and referenced every possible document: the 1981 EIS–PACR, the 1982 SIPACR, the September 1983 FEIS, and the February 1984 SIR. Language "urged the earliest possible completion of the project."

This action to appropriate funds for Wallisville also runs into legal difficulty. Not only is the 1983 Congressional action flawed by reliance on incomplete administrative data in the EIS–PACR and SIPACR; it remains tainted despite post-1983 efforts of the Corps to complete administrative processing of the documents to square with the already enacted legislation. As an alternative position, it is then contended that the same Corps efforts and resulting documents itemized above serve as a valid NEPA basis for the 1985 appropriation, which Defendants now contend is also a new authorization by implication for Wallisville. Unfortunately, the law does not support this latest position, and the end result is that the requirements of NEPA have never been met in any respect. In sum, Congress simply exceeded its authority and infringed the Corps' sphere while the NEPA process was under way. After ten years of NEPA administrative activity, Congress' premature action in 1983 resulted in interference with the Corps' own internal NEPA procedures which were in the process, although somewhat dilatorily, of being implemented in accordance with the statute. After enacting the environmental law, it is apparent that Congress has declined in this instance to abide by its own legislation. Such an attempt to circumvent its mandate cannot be condoned by this Court. If there is to be judicial approval of this novel course of action to satisfy NEPA, it will have to come from a higher court.

III.

THE CONTENTIONS OF THE CORPS

The Corps takes several positions which it asserts rectify any possible NEPA procedural defects, and constitute adequate administrative compliance with NEPA to buttress and thereby validate subsequent authorization and appropriation of the project by Congress. Curiously, not a single thesis advanced can withstand legal analysis, and the Court is left with no choice but to deny the requested relief and leave the injunction intact until both the Corps and Con-

gress comply with the letter and spirit of NEPA. The contentions of the Corps in support of its position will now be taken up seriatim.

## A.

### Corps Actions to 1983—Congressional Action 1983

It is contended that the explicit 1983 authorization and appropriation of the Wallisville project rest on full NEPA analysis and documentation which permit the Congress to make a fully informed environmental decision and legislate accordingly.

Although the argument can be made that the 1983 Congressional action did not constitute actual authorization of the project, the Court has reviewed the issue and finds to the contrary. There was explicit authorization at that time. However, Congress relied upon and referenced the 1981 EIS–PACR and the 1982 SIPACR as its authority for its statutorily mandated 1983 informed decision. This does not comport with the law, since neither document ever made its way to completion through the NEPA administrative pipeline before being relied upon by the Congress. The EIS–PACR which actually had received full agency scrutiny bogged down at the OCE level where it remained until after the 1983 Congressional action. The SIPACR never had been circulated for any agency or individual review, and constituted nothing more than raw, unprocessed data prior to Congressional action. Actually, this is uncontested by the Corps which sought to characterize the SIPACR only as an internal agency document not for Congressional consideration.

Another point should be made. It cannot even be said that what the Congress prematurely and improperly lifted out of the Corps' administrative stream as authority for its 1983 action on the project was consistent within itself, since the SIPACR was much broader in purpose and constituted a new and substantially different project from that contained in the EIS–PACR. At no point were these differences resolved. Thus, the 1983 Authorization and Appropriation Bill with respect to Wallisville violates NEPA, since the Congress never received from the Corps what the statute impels—a hard look in good faith at the environmental consequences of a proposed action by the agency to permit a reasoned choice among different courses of action.

## B.

### Corps Actions 1983–1985

It is contended by the Corps that any procedural NEPA defects existing at the time of the 1983 Congressional action were cured thereafter by the Corps administrative action prior to the 1985 appropriation for the Wallisville project.

Once again, it is imperative to bear in mind what Congress intended as the Court's role when NEPA was passed as the law of the land. The purpose of judicial review under NEPA is to ensure the procedural integrity of the agency's consideration of the environmental factors in the environmental impact statement. If that is accomplished, Congress then has before it a striking array of expertise which can be intelligently assessed, and utilized in reaching a fully informed and well considered legislative decision.

What happened after the 1983 authorization is without precedent. After Congress prematurely acted in reliance on the statutorily deficient EIS–PACR and unprocessed SIPACR, the Corps did not know what to do. General Dacey so testified. Congress had expressed it will without full NEPA agency input, and in doing so it literally preempted the agency role of the Corps. What occurred thereafter at the Corps level was not to enlighten Congress so that it could enact legislation effectively; rather, it was to square its administrative decisions with the already accomplished Congressional authorization of Wallisville by expediting the process of the incomplete EIS–PACR and SIPACR through the administrative steps to the EPA, and thereafter into the ROD which theoretically documents the Corps recommendation to Congress. By its belated action, the Corps' procedures were

meant to comport, at least on paper, with standard NEPA processing patterns. Rhetorically, the question must be asked—how can the Corps under such circumstances perform its NEPA function and make a good faith environmental assessment of the project for Congress to consider when Congress has already made up its mind and independently legislated?

Apparently recognizing possible procedural defects with the supporting NEPA data on which the 1983 Congressional action rests, the Corps now takes an alternative tack. It relies on the above Corps' action subsequent to the 1983 Congressional authorization to satisfy its statutory good faith investigative role under NEPA for new legislation—the 1985 appropriation. Having assumed this to be so, the embraced rationale of the Corps is that the 1985 Appropriations Act which references all documents for the 1981 EIS–PACR through the 1984 ROD somehow implicitly reauthorized Wallisville, regardless of any past statutory procedural deficiencies.

It takes but a moment to recognize that there is no procedural integrity in this reasoning. There has been no good faith pursuit of the environmental assets and liabilities of Wallisville by the Corps for Congress to consider. Since Congress already had acted in 1983, the Corps, after the fact, was not investigating and advising Congress on environmental matters pursuant to NEPA; it was only setting its own house in order procedurally after the action of Congress had eviscerated the intent of its own statute when it dictated the desired result to the Corps through its premature legislation. To permit this form of agency and legislative legerdemain to succeed is virtually to sound the death knell of NEPA.

## C.

### *Congressional Action—1985*

It is contended that the 1985 Supplemental Appropriations Act is also an act implicitedly authorizing the Wallisville project if it had not been authorized specifically before.

There is a distinction in the law between what constitutes reauthorization of a project, and what constitutes appropriation of a project. Basically, language in an appropriations act cannot serve as substantive legislation unless Congressional intent is clear through an extensive examination of the legislative history. This difference is significant in this case, for the Corps is contending that since Congress has spoken by appropriating funds in 1985, then the need for Court review is foreclosed.

Furthermore, the Corps' assertion that similar language authored by the Senate and House Appropriations Committees and contained in two reports which accompany the Energy and Water Development Appropriation Bill for 1986 exhibits Congressional intent to reauthorize Wallisville by implication, is clearly erroneous. The deficiencies in satisfying NEPA are not cured by anual Congressional recitations appropriating funds for the project. The appropriations bill in 1985 had the specific purpose of merely providing funds for Wallisville which had been specifically reauthorized in 1983, but based on incomplete NEPA documentation. The legislative history of the 1985 bill does not contain language which would indicate that Congress intended the 1985 Act to play the dual role of appropriation and implicit reauthorization of the project. Rather, the language contained in the committee reports, after being carefully scrutinized, does not reflect the intent of Congress to reauthorize the project, but instead reflects the beliefs and isolated remarks of the committees. Yet, apart from the controlling legal distinction between authorization and appropriation bills, the core deficiency throughout is the fundamental failure of the Corps to adhere to the basic good faith requirements of NEPA before a project reaches the Congress for its consideration.

## IV.

### FUNCTION OF THE MULTIPLE ACTORS

#### A. *Court Role—Standard of Review*

"The purpose of judicial review under NEPA is to ensure the procedural integrity

of the agency's consideration of environmental factors in the EIS...." *Sierra Club v. Sigler,* 695 F.2d 957, 966 (5th Cir. 1983). The Court is not concerned "with the merits of the agency's decision; our concern instead is with the integrity of NEPA–EIS process used to make that decision." *Id.* at 965. Moreover, this Court must apply a "rule of reason" and not "fly speck" the EIS when determining procedural compliance with NEPA. *Citizens of Mass Transit, Inc. v. Adams,* 630 F.2d 309, 313 (5th Cir.1980), *citing, Lathan v. Brinegar,* 506 F.2d 677, 693 (9th Cir.1974).

■ Always mindful of what constitutes limited judicial review, the federal courts have the primary responsibility for interpreting the requirements of NEPA. *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (Marshall, J., concurring in part and dissenting in part). A court reviewing "an agency decision to go forward with a major federal action after the agency has prepared and considered an Environmental Impact Statement, ..." *Concord Township v. United States,* 625 F.2d 1068, 1073 (3d Cir.1980) (footnote omitted) has "a limited, albeit important," role. *Baltimore Gas and Electric,* 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). The Court must ... *determine whether all necessary procedures were followed,* to consider de novo all relevant questions of law, and to examine the facts to determine whether the decision was arbitrary, capricious, and an abuse of discretion. The reviewing court must adopt that posture because NEPA, while establishing significant substantive goals for the Nation, *imposed upon agencies duties that are essentially procedural.* NEPA was designed to insure a fully informed and well-considered decision, but not necessarily a decision the judges ... would have reached had they been members of the decisionmaking unit of the agency. Once an agency has made a decision *subject to NEPA's procedural requirements,* the only role for a Court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of action to be taken.

*Township of Springfield v. Lewis,* 702 F.2d 426, 441 (3d Cir.1983) (citations omitted) (emphasis added); *see* Administrative Procedure Act, 5 U.S.C. § 706(2); *accord Baltimore Gas & Electric,* 462 U.S. at 98, 103 S.Ct. at 2253, *citing Overton Park,* 401 U.S. 402, 415–17, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *Fritiofson v. Alexander,* 772 F.2d 1225 (5th Cir.1985).

The Fifth Circuit has refined this standard affirming the use of a reasonableness approach which "is clearly a 'more rigorous standard ... than the rule of arbitrary and capricious review that ordinarily governs agency actions.'" *Fritiofson,* 772 F.2d at 1238, *quoting State of Louisiana v. Lee,* 758 F.2d 1081, 1084 (5th Cir.1985). In applying the reasonableness test, the Court may "receive and weigh evidence beyond that in the administrative record, *see Hiram Clarke Civil Club v. Lynn,* 476 F.2d 421, 425 (5th Cir.1973), and should at least satisfy itself that the agency has taken a 'hard look' at the environmental concerns raised by the plaintiffs and the factors made relevant by the various regulations implementing NEPA." *Fritiofson,* 772 F.2d at 1238, *citing Vieux Carre Property Owners v. Pierce,* 719 F.2d 1272, 1282 (5th Cir.1983).

However, an agency decision is entitled to a "presumption of regularity," *Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823, and "[a]dministrative decisions should be set aside ... only for substantial procedural or substantive reasons as mandated by statute ..., not simply because the court is unhappy with the result reached." *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Moreover, an agency "decision of less than ideal clarity [will be upheld] if the agency's path may be reasonably discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *see Ver-*

*mont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215.

In evaluating the adequacy of an EIS to ascertain whether or not compliance with NEPA has been attained, the Fifth Circuit has set forth the following criteria:

1) whether the agency in good faith objectively has taken a hard look at the environmental consequences of a proposed action and alternatives;

2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and

3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action.

*Isle of Hope Historical Association, Inc. v. United States Army Corps of Engineers,* 646 F.2d 215, 220 (5th Cir.1981) (per curiam) (adopting opinion of District Court), *citing, Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Authority,* 576 F.2d 573 (5th Cir.1978); *Texas Committee on Natural Resources v. Marsh,* 736 F.2d 262, 266, *reh'g granted in part,* 741 F.2d 823 (5th Cir.1984). In essence, "[o]ur review is therefore limited to the Corps' procedural compliance with NEPA ..." *South Louisiana Environmental Council, Inc. v. Sand,* 629 F.2d 1005, 1013 (5th Cir.1980). Keeping in mind a court's limited NEPA role when reviewing an agency action, in this unprecedented case involving a Congressional departure from the norm the Court must also recall its primary role within our system of government.

Speaking generally, the American system is one of checks and balances among the Executive, Legislative, and Judicial branches of government.[6] This Court must also assert its watchful eye in accordance with its duty within our system of government. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819).

**B. *Agency Role***

NEPA directs "all agencies of the Federal Government" ... to prepare impact statements for "major Federal actions significantly affecting the quality of human environment" ... 42 U.S.C. § 4332(2)(c). In other words, NEPA requires federal agencies to consider significant environmental impacts of a proposed project, and to inform the public of the results of their research. *Baltimore Gas & Electric Co.,* 462 U.S. at 89, 103 S.Ct. at 2248. The duties imposed by the statute are "essentially procedural." *Vermont Yankee,* 435 U.S. at 558, 98 S.Ct. at 1219.

NEPA created the Council on Environmental Quality, *see* 42 U.S.C. § 4321; § 4372, which has promulgated regulations designed to instruct federal agencies on their role in order to achieve NEPA compliance, as well as to direct federal agencies to enunciate their own regulations. *See* 40 C.F.R. § 1500.2 (1984). Moreover, the courts have held that these regulations are binding on the federal agencies. *See State of Louisiana,* 758 F.2d at 1083; *Sigler,* 695 F.2d at 972, *citing, Andrus v. Sierra Club,* 442 U.S. 347, 356–58, 99 S.Ct. 2335, 2340–41, 60 L.Ed.2d 943 (1979). In complying with the directive of CEQ, the Corps has implemented its own regulations and procedures to achieve NEPA compliance. *See* 33 C.F.R. § 230.1, *et seq.* (1985).

**C. *Congressional Role***

■ By requiring an impact statement under NEPA, Congress wanted to ensure that during the resolution process, the envi-

---

6. For a comprehensive review of the development of the theory of separation of powers, *see* W.B. Gwyn, *The Meaning of the Separation of Powers* (Tulane Univ.1965); M.J.C. Vile, *Constitutionalism and the Separation of Powers* (Clarendon Press 1967); Sharp, *The Classical American Doctrine of "the Separation of Powers",* 2 U.Chi.L.Rev. 385 (1935). *Cf. Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97

S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977) (footnote omitted) wherein the majority opinion stated:

Like the District Court, we therefore find that appellant's argument rests upon an "archaic view of the separation of powers as requiring three airtight departments of government ..." *quoting Nixon v. Administrator of General Services,* 408 F.Supp. 321, 342 (D.D.C.1976).

ronmental impingements of any action would be considered by all federal agencies. *Kleppe,* 427 U.S. at 410, 96 S.Ct. at 2730. Congress in its role as the ultimate decision-making body can endorse and exempt projects from the requirements of NEPA.[7] *See Environmental Defense Fund, Inc. v. Froehlke,* 473 F.2d at 353; *Sierra Club v. Froehlke,* 392 F.Supp. 130, 141 (E.D.Mo.1975), *aff'd,* 534 F.2d 1289 (8th Cir.1976). If, however, Congress exempts a project from NEPA, it must do so explicitly within the legislation. *See League of Women Voters of Tulsa, Inc. v. United States Corps of Engineers,* 730 F.2d 579, 586 (10th Cir.1984) (concurring, Seymour, J.); *see also Navajo Tribe of Indians v. Andrus,* 644 F.2d 790 (9th Cir.1981) (wherein the Circuit Court dismissed the appeal as moot after Congress amended the legislation to specifically exempt the stock reduction mandate from NEPA requirements.) Here, however, Congress never explicitly exempted the Wallisville project from NEPA.

■ Accordingly, while this Court recognizes that it cannot substitute its judgment for that of Congress, *Sand,* 629 F.2d at 1013; *Sierra Club v. Froehlke,* 392 F.Supp. at 141, it is also clear that NEPA, a Congressional statute, applies with full vigor to Wallisville.

## V.

### REVIEW OF THE CORPS NEPA PROCEDURE

As is evident from the list contained in footnote 2, NEPA and the Corps have spawned a plethora of acronyms and other alphabetical combinations to identify a number of offices, agencies, reports, and statements employed in processing a given project through the administrative and procedural wickets to ultimate congressional consideration. Following and comprehending the standard procedural steps can be taxing enough to the uninitiated layman; yet, it is the curious departure from traditional process by the Corps and Congress that raises one of the most critical issues in this litigation, a situation which this Court has found in no other reported case. *See also* Exhibit B.

After the Fifth Circuit reversed and remanded this Court's prior decision, the Corps undertook re-evaluation studies. In July, 1979 the Corps filed a combined EIS–PACR with the EPA.[8] Thereafter, these documents were circulated among various agencies and individuals for comments.[9] Having solicited the comments, the Corps modified the EIS–PACR, and forwarded it to the Division Engineer of the Southwestern Division for further processing.[10] Thereafter, the Division Engineer in Dallas approved the conclusions and recommendations contained in the EIS–PACR and forwarded the documents to BERH [11] in October 1981.[12] In March 1982, BERH transmitted EIS–PACR to OCE for resolution of policy issues.[13] Specifically, the transmittal was to determine whether or not the Chief of Engineers could reauthorize the project without obtaining Congressional ap-

---

**7.** *See Harrington v. Bush,* 553 F.2d 190 (D.C.Cir. 1977).

**8.** Vol. 2, pg. 338.

**9.** Comments were solicited from various organizations such as Sierra Club, Houston Audubon Society, Houston Sportsman's Club, Texas Shrimp Association, National Marine Fisheries Service, National Parks Service, Environmental Protection Agency, Fish and Wildlife Service, Wildlife Management Institute, as well as agencies of the State of Texas. *See, e.g.,* Vol. 1, pg. 206–334; Vol. 4, pg. 1391, *et seq.*

**10.** Vol. 2, pg. 344.

**11.** *Id.;* BERH is comprised of a review team consisting of a project manager, economist, and environmentalist who make an initial assessment of the documents by making a site visit, conferring with the field staff, and ultimately preparing memoranda and working papers for the Board. Vol. 7, pg. 2552. Thereafter, the staff prepares an analysis which has no binding effect on the BERH's findings. Moreover, in making its findings, BERH applies the Corps of Engineers' policy in a uniform manner across the country. Testimony of Mr. Wooley.

**12.** Vol. 2, pg. 338.

**13.** *Id.;* Testimony of Mr. Wooley.

proval.[14] If the projected purposes between the original plan and the modified plan outlined in EIS–PACR were essentially the same, then the Chief of Engineers may have been able to reauthorize the project without Congressional action.

No decision was reached. Instead, in response to requests by OCE, the Corps undertook to prepare the SIPACR dated July 1982,[15] which never was coordinated with any agencies pursuant to NEPA. Certain matters are apparent from the record. After the EIS–PACR had languished in the OCE for over a year,[16] the OCE in March 1983 received a legal opinion from its own counsel as well as one from another department head expressing the view that it would be inappropriate for the Chief of Engineers to exercise his discretionary authority in approving the project.[17]

In the normal course of the NEPA procedure, at this stage, the EIS–PACR would have been filed with CEQ after OCE approval.[18] However, it was at this step that an unprecedented change in direction occurred in the NEPA process. While the EIS–PACR was still under consideration by the Chief of Engineers at OCE, Congress inexplicably intervened and reauthorized the project[19] in July 1983 in a bill that referenced and relied upon the SIPACR which had never been through NEPA review.[20] At the time of Congressional action, the EIS–PACR was still at OCE and had not proceeded through the entire NEPA process. According to the internal Corps' procedures outlined by General Da-

cey, the EIS–PACR should have been forwarded to the Assistant Secretary of Army for coordination with the Office of Management and Budget. Thereafter, EIS–PACR would have been ready for Congressional review. As to the SIPACR, the Corps admittedly had not processed that document pursuant to NEPA requirements, a procedure which the Corps now claims was unnecessary since it was an internal document. As will be pointed out hereafter, this was error. The Court has no difficulty from an analysis of its contents and the record in determining that the SIPACR was a SEIS and thereby sufficient to trigger the requirement of full NEPA coordination and processing.

After Congress reauthorized the project in July 1983 based upon the untested SIPACR and the partially processed EIS–PACR, the Corps in an effort to comply with the NEPA process and to conform to Congressional action, expedited the filing of the EIS–PACR with the EPA on September 28, 1983, and solicited comments from the agencies on SIPACR. Based on agency comments obtained only *after* Congressional reauthorization in 1983, the SIR was prepared and released in February 1984.[21] Subsequently, the Corps reviewed the recommended modifications, and found the project to be in compliance with the environmental laws and regulations in the ROD dated February 25, 1984.[22]

On November 1, 1985, Congress again took action and appropriated project

---

**14.** See Vol. 6, pg. 1946–47. *Cf.* Vol. 6, pg. 2169 wherein the summary of SIPACR states that the project authorization was within the Chief's discretionary authority, as opposed to the letter addressed to the Commander of the Corps from the Corps lower division advising that it would be inappropriate for the Chief to exercise his discretionary authority in approving the project. While these divergent statements have no direct bearing on this Court's decision, it does reflect the confusion and contradiction of the Corps during the NEPA processing of Wallisville.

**15.** *Id.*

**16.** *See* Vol. 6, pg. 2163.

**17.** *See* Vol. 6, pg. 2176 and Vol. 6, pg. 2169.

**18.** *See* Defendants' Exhibit 28. for a quickhand reference of the Corps' procedures, *see* Exhibit "B" attached herein.

**19.** Supplemental Appropriations Act, 1983. Pub.L. No. 98–63, 97 Stat. 301, 311 (1983).

**20.** The Corps concedes that SIPACR's findings were developed without NEPA agency coordination. Vol. 1, pg. 193.

**21.** Vol. 1, pg. 27.

**22.** Vol. 1, pg. 23–26; the record of decision is the final recommendation by the Corps on a project requiring an EIS prior to Congressional action. *See* 33 C.F.R. 230.12 (1985).

funds.[23] Both the House and Senate Committees in reports accompanying the Energy and Water Development Appropriation Bill set forth similar statements concerning the Wallisville project. Specifically, the Senate Committee stated:

> ... The Committee believes that the February 25, 1984, record of decision, as supported by the Post-Authorization Change Report (July 1981) [PACR], the Supplemental Information to the Post-Authorization Change Report (July 1982) [SIPACR], the Final Environmental Impact Statement ... (September 1983), [FEIS] and the Supplemental Information Report to the Final Impact Statement (February 1984) [SIR], provide a sound basis for investigation of the environmental impacts of the project and urges the earliest possible completion of the project.[24]

Keeping in mind this Court's function in this intricate maze of facts, the Court now turns to a review of the Corps' procedural actions in light of the legal test set forth in *Isle of Hope*, and reiterated herein.

## VI

### CORPS' LACK OF GOOD FAITH

In reviewing the expansive administrative record of some 32 volumes, the record of this hearing, the memoranda of the parties, as well as the applicable regulations, this Court is compelled to conclude that bad faith existed on the part of the Corps.

■ The Corps' position as to what precipitated Congress' actions which resulted in the circumvention of the Corps' NEPA process is one of professed ignorance. Specifically, the Corps submits that it, as an agency, did not refer the incomplete documents to Congress.[25] In fact, the record does not reveal how Congress procured the documents prematurely. General Dacey testified that the manner in which Congress obtained the documents was a mystery. Moreover, General Dacey acknowledged that Congress had usurped the agency function and had acted in contravention of the Corps' NEPA procedures. However, defendants' claim of ignorance cannot withstand scrutiny, nor does it comport with its obligations under the law. "The Corps, ... cannot avoid NEPA responsibilities by cloaking itself in ignorance." *Fritiofson*, 772 F.2d at 1244. The Corps is solely responsible for ensuring total compliance with its own internal NEPA procedures. At the very least, the Corps had a duty to sound the alarm and alert Congress that it was proceeding on untested and fragmentary information, which had not made its way through the NEPA process.

■ Moreover, as to SIPACR, the Corps argues vigorously that the document was for internal use only, was not a SEIS, and therefore was not subject to NEPA interagency coordination.[26] However, this argument is directly counter to the Corps' actions, once it was aware that Congress had passed its July 1983 legislation concerning Wallisville in which it specifically relied upon and cited with approval the

---

**23.** Although the Corps acknowledges this Court's limited review power under NEPA, the Corps argues that Congress' legislative action forecloses the need for Court review. Essentially, the Corps argument is "... that review on the merits is not proper in this case because Congress appropriated money for the project ... [and] that the decision of Congress to fund the project ... makes the decision ... a Congressional one not subject to review by the Courts." *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d at 353. While this Court has no intention of supplanting Congressional decisions, this Court will review for compliance with NEPA since "... an appropriation act cannot change the requirements of NEPA." *Id.* at 355. *See*

*James River Flood Control Association v. Watt*, 553 F.Supp. 1284, 1296 (D.S.D.1982).

**24.** Defendants' Exhibits 24, 26, 27; H.R. 195, 99th Cong., 1st Sess. 37 (1985); S.R.Rep. No. 110, 99th Cong., 1st Sess. (1985).

**25.** *See* Defendants' and Defendant-Intervenors' Post-Trial Brief. Without specifically stating, the implication of the Corps' argument is that its hands were clean, and if there was any misconduct, it was on the part of Congress.

**26.** The record is replete with references to SIPACR as a supplement. *See, e.g.,* Vol. 1, pg. 23; Vol. 2, pg. 335.

SIPACR and the EIS–PACR. It was at this point that the Corps scrambled to "get its house in order." For example, the Corps proceeded to file the EIS–PACR with EPA in September 1983, solicited comments on the SIPACR reflected in the SIR,[27] and made its ROD which theoretically documented the Corps' final recommendation to Congress. All of these tardy acts were made in an attempt to square the EIS–PACR, and SIPACR with Congressional action. This is borne out by the testimony of General Dacey who conceded that the Corps was in a quandary as to what to do in view of Congress' premature legislative action before the Corps completed its administrative processing. Since the Corps chose to implement the NEPA procedures on teh SIPACR, the Corps cannot now claim that SIPACR is an internal document not subject to NEPA coordination. In essence, " '[b]y its [the Corps] own use of the standards [procedures], it has made them applicable ...' " *Sigler*, 695 F.2d at 966, *quoting NRDC v. Callaway*, 524 F.2d 79, 85 (2d Cir.1974). "[I]f the agency follows a particular procedure, it is only logical to review the agency's adherence to that procedure not to some altogether different one that was not used." *Sigler*, 695 F.2d at 966. Accordingly, this Court is of the opinion and so finds that SIPACR is a SEIS, due both to the Corps' post-Congressional, self-imposed actions, and to this Court's assessment from examination of the record that the SIPACR is a SEIS and, therefore, subject to NEPA coordination.

The Corps argues that SIPACR is not a SEIS, while the Plaintiffs assert that the 1982 SIPACR proposes significant changes from the 1981 EIS–PACR, thereby subjecting it to the NEPA process. In essence, Plaintiffs are arguing that SIPACR should have been circulated in draft form so that a good faith look at the environmental consequences could have been achieved before Congressional action.

■ "In determining whether a supplemental EIS is required, the legal standard is essentially the same as the standard for determining the need for an original EIS." *Louisiana Wildlife Federation v. York*, 761 F.2d 1044, 1051 (5th Cir.1985) (footnote omitted). A supplement is required if the project may have significant impacts upon the environment not considered in the original EIS. *Environmental Defense Fund, Inc. v. Marsh*, 651 F.2d at 992. " 'The principal factor an agency should consider in exercising its discretion whether to supplement an existing EIS because of new information is the extent to which the new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original EIS.' The issue is not whether the new information is directly environmental but whether, whatever its nature, it 'raises new concerns of sufficient gravity such that another, formal in-depth look at the environmental consequences of the proposed action is necessary.' That is, whether it 'provides a *seriously* different picture of the environmental landscape such that another hard look is necessary.' " *Louisiana Wildlife Federation*, 761 F.2d at 1051, *quoting Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir.1984) (footnotes omitted) (emphasis added). Moreover, " 'it is the initial responsibility of the Corps to apply this standard and decide whether or not a supplemental EIS is necessary. If a party affected by that decision challenges it in court and raises a "substantial environmental issue," the reviewing court should uphold the agency's decision only if it is reasonable ...' " *Louisiana Wildlife Federation*, 761 F.2d at 1051–52, (footnotes omitted).

■ "[A] party challenging the Corps' decision not to file a [SEIS] has two burdens: First, it must raise a 'substantial environmental issue' ... Second, the plain-

---

**27.** As further evidence of the Corps' bad faith, no true interagency consultation was effected in the formulation of SIPACR. To date, the Corps has not sought to consult or coordinate with the NMFS despite the agency's request. Testimony of Don Moore; Vol. 1, pg. 183; Plaintiffs' Exhibit 10. *Cf.* the ROD where General Dacey states that agency coordination took effect on September 21, 1983. Vol. 1, pg. 25.

tiff must show that, with respect to the environmental issue, the Corps did not act reasonably. 'The standard of judicial review is whether the agency decision not to develop an impact statement is reasonable and made objectively and in good faith *on a reviewable environmental record* ...'" *Id.,* (footnotes omitted) (emphasis added). Moreover, in order to raise a substantial environmental issue, the Sierra Club need only show that the project *may* have significant impacts as opposed to *will* have significant impacts. *See Fritiofson,* 772 F.2d at 1238, n. 7. Additionally,

■t is clear that a decision to forego preparation of an EIS may be unreasonable for at least two distinct reasons: (1) ... the project *may* have a significant impact on the human environment ..., or (2) the agency's review was flawed in such a manner that it cannot yet be said whether the project may have a significant impact ... The appropriate relief, moreover, depends upon which of these findings the district court makes.

*Id.* (citations omitted) (footnote omitted) (emphasis supplied). If the Court makes the former finding, then it is appropriate to order a SEIS. On the other hand, if the latter finding is made, then the Court should remand to the agency. *Id.*

The Corps' own regulations require a supplement "whenever significant impacts resulting from changes in the proposed plan or new significant impact formation, criteria or circumstances relevant to environmental considerations impact on the recommended plan or proposed action as dis-

cussed in 40 C.F.R. § 1502.9(c). A supplement to a draft EIS will be prepared, filed and circulated in the same manner as a draft EIS ... A supplement to a final EIS will be prepared and filed first as a *draft* supplement and then as a *final* supplement. Both documents will be filed and circulated in the same manner as a draft and final EIS ..." 33 C.F.R. § 230.11(b) (1985) (emphasis supplied). Moreover, the CEQ regulations provide that a supplement will be filed "if [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c) (1985).

■ Turning to an analysis of the differences between the EIS–PACR and SI-PACR, the Court must make a determination as to whether or not these changes may constitute a significant impact having an effect on the human environment.

Plaintiffs argue that the difference between the 1981 EIS–PACR and the 1982 SIPACR regarding wildlife enhancement [28] is a significant change.[29] Essentially, the EIS–PACR concluded that fish and wildlife enhancement should be deleted as a project purpose, while SIPACR recommended retention of that purpose.[30] As a result, SIPACR evaluated the benefits of that project purpose.

Additionally, plaintiffs contend [31] that EIS–PACR did not analyze a navigation purpose as opposed to SIPACR. Although

---

**28.** The 1981 EIS–PACR documents reported annual losses of $989,000 while the 1982 SIPACR documents reported $122,000 enhancement value annually. Vol. 2, pg. 346; Vol. 2, pg. 338.

**29.** The NMFS and other agencies have considered this a significant change. Testimony of Don Moore; Vol. 1, pg. 191.

**30.** Although the Plaintiffs point out more differences than fish and wildlife and navigation between the 1981 and 1982 documents, for purposes of ascertaining whether SIPACR is a SEIS, the Court will discuss these two purposes, only.

**31.** In a nutshell, Defendants are contending that any difference between the 1981 documents and

the 1982 SIPACR is merely an economic change, and not an environmental change. In other words, even though the 1981 document did not quantify impacts, it did qualify them, and any changes are merely quantification of previously recognized impacts. Therefore, Defendants argue, since no "significant impacts resulting from changes in the proposed plan," *see* 33 C.F.R. § 230.11(b) (1985), or no "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," *see* 40 C.F.R. § 1502.9(c) (1985) occurred, SIPACR is not a supplemental EIS subject to NEPA coordination.

EIS–PACR found that navigation improvements should be deferred, SIPACR analyzed the project to include navigational benefits [32] for existing and future commercial navigational benefits on the Trinity River. Specifically, SIPACR states:

> ... This report was prepared in response to that request. Whereas the PACR was written as if the Wallisville modifications were a new project requiring a new Congressional investment decision, this supplemental report analyzes the project as a "continuing project" and presents information on the base condition and the without-project conditions. Water supply benefits have been recomputed using current guidance; fish and wildlife values have been re-analyzed from a most-likely without-project condition, i.e., total abandonment of the Wallisville Project; navigation benefits attributable to the Wallisville Project have been quantified; and the Wallisville Project and the Liberty Multiple Purpose Channel have been analyzed as a single, multiple-purpose project.[33]

In essence, while "[t]he previous EIS might still be valid in relation to the aspects of the project that have not been changed ... NEPA ... require[s] the supplementation of an EIS when subsequent project changes can, in qualitative or quantitative terms, be classified as [a significant change]." *Environmental Defense Fund, Inc. v. Marsh*, 651 F.2d at 991. In sum, this Court has made a prior determination that SIPACR is a SEIS and subject to the NEPA process based on the Corps' own internal assessment after the 1983 Congressional action and its application of a SIPACR NEPA review. The Court also finds, based on the applicable law, that Plaintiffs have raised a substantial environmental issue, and that the Corps' decision not to supplement EIS–PACR was unrea-

sonable since the SIPACR sets forth changes in the project that may have a significant impact on the human environment.[34] Therefore, SIPACR should have been designated as a SEIS and subject to NEPA coordination.

Other proof casts the Corps' position in an even more precarious light. Mr. Wooley testified that had the Corps *known* SIPACR was going to be utilized by Congress, then NEPA coordination would have been effectuated. However, this argument is squarely refuted by the evidence. In March, 1983 (about four to five months before Congress acted), the Galveston office of the Corps received letters from OCE including its legal counsel advising it that the Chief could not approve the project, as such approval had been determined to be beyond the scope of the Chief's discretionary authority.[35] Counsel's specific views are even more telling. He stated that the desired project changes were so fundamental as to result in a new project "substantially different from the project authorized by Congress." He also observed that "the agency has traditionally returned to Congress for additional authorization in the case of significant project changes."

Even before March, 1983, officials of the Galveston District and the Corps' Southwestern Division (Dallas) prepared a "draft legislation" to be used by Congress in approving the project. This draft dated February 28, 1983 crossed out a reference to an OCE decision on the project, and inserted references to Congressional supplemental appropriations bill.[36] Surprisingly, the incomplete 1982 SIPACR was added to the PACR by handwritten insertion and thereby included in this draft legislation prepared by the Corps as a document to be used by Congress in its forthcoming Wallis-

---

32. Vol. 2, pg. 353.

33. Vol. 2, pg. 344; Vol. 2, pg. 353; Vol. 2, pg. 359.

34. The administrative record indicates that SIPACR made substantial and significant changes to the project. *See* Vol. 6, pg. 2176.

35. Vol. 6, pg. 2169; Vol. 6, pg. 2176. Further, Mr. Wooley testified that, under Corps' procedures, if the Chief could not act to approve the project, then the remaining approval forum was Congress.

36. Vol. 6, pg. 2180–81.

ville project appropriation in July 1983. While this Court recognizes that the Corps could *draft* legislation without necessarily *proposing* that legislation to Congress, *see* 40 C.F.R. § 1508.17 (1984) (emphasis added), the Court does not refer to the "draft legislation" for the purpose of establishing that the Corps *proposed* the 1983 legislation to Congress. Instead, the draft legislation demonstrates that the Corps was using language obtained from "FY 83 Supplemental Appropriation Bill" and, therefore, knew that SIPACR was to be included in the Congressional bill of 1983.

This sequence of events belies the Corps' contention that it did not anticipate Congress' premature actions. Additionally, the Director of Civil Works of the Office of the Chief of Engineers was notified of a Congressman's attempt to secure clarifying language in the 1983 appropriation bill by the Executive Services Manager of the Trinity River Authority,[37] and was supplied with a copy of the Congressman's letter to the Chairman of the Subcommittee on Water Resources. Ironically, the clarifying language referred to in the Congressman's letter to the Chairman of the Subcommittee encompassed the SIPACR, and was identical to the language embodied in P.L. 98–63 of 1983.[38] This language was transmitted to Mr. Wooley of the Galveston District.[39] Accordingly, this Court is convinced that the Corps had prior knowledge of and, therefore, anticipated that Congressional action on a 1983 supplemental appropriations bill was contemplated before the NEPA process was completed by the Corps.

▮ In sum, the Corps knew SIPACR was intended for Congressional use; yet when Congress somehow acquired the documents from the Corps NEPA process prematurely, the Corps did nothing but claim surprise and ignorance. Then, following enactment of the appropriations bill of 1983, in an effort to comply pro forma with NEPA and appear consistent with previous Congressional action, the Corps conducted post-approval procedures. All of these actions point toward a lack of good faith on the part of the Corps. As a result, the Corps has failed to satisfy the first prong of the test outlined in *Isle of Hope*, 646 F.2d at 220. The Corps did not take a hard look at the environmental consequences in *good faith* objectivity. Instead, it abdicated its function which was to ensure under NEPA that Congress receive an adequate environmental impact assessment on which it could base its action.

## VII.

### CONGRESSIONAL ACTION
### 1983 VS. 1985

In 1983 Congress reauthorized the modified plan outlined in the EIS–PACR referencing SIPACR. Specifically, Pub.L. 98–63 (1983), entitled "Supplemental Appropriations Act, 1983" states:

The Wallisville Reservoir, Texas, project, authorized by section 101 of the River and Harbor Act of 1962 (Public Law 87–874), is hereby modified with respect to its physical elements and planned operation as recommended in the Wallisville Lake, Texas, Post-Authorization Change Report, July 1981, as supplemented, July, 1982.

Moreover, the Committee report to the 1983 Congressional action stated:

Wallisville Lake, Texas—The committee notes that the Fiscal Year 1983 Supplemental Appropriations Bill provides necessary authorization authority for the Wallisville Lake project ...

*See* Vol. 1, pg. 21.

In 1985, Congress appropriated funds for the Wallisville project. In two reports accompanying the bill and authored by the Senate and House appropriations committees, similar language was inserted which referenced NEPA documents. Specifically, the Senate Committee stated:

---

**37.** Vol. 6, pg. 2157; Vol. 6, pg. 2162–63.

**38.** Vol. 6, pg. 2158; Vol. 6, pg. 2147.

**39.** Vol. 6, pg. 2159.

... The committee believes that the February 25, 1984, record of decision, as supported by the Post-Authorization Change Report (July 1981), the Supplemental Information to be Post-Authorization Change Report (July 1982), the Final Environmental Impact Statement ... (September 1983), and the Supplemental Information Report to the Final Impact Statement (February 1984), provide a sound basis for investigation of the environmental impacts of the project and urges the earliest possible completion of the project.

S.R.Rep. No. 110, 99th Cong., 1st Sess. (1985).

In *Andrus v. Sierra Club*, 442 U.S. 347, 359, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979), the Supreme Court reiterated and acknowledged the Congressional distinction between "legislation" (authorization) and "appropriation" citing the Comptroller General's published definitions. Specifically, "authorizing legislation" is defined as:

"Basic substantive legislation enacted by Congress which sets up or continues the legal operation of a Federal program or agency either indefinitely or for a specific period of time or sanctions a particular type of obligation or expenditure within a program. Such legislation is normally a prerequisite for subsequent appropriations or other kinds of budget authority to be contained in appropriations acts ..."

Appropriations, on the other hand is defined as: "An authorization by an act of the Congress that permits Federal agencies to incur obligations ... An appropriation usually follows enactment of authorizing legislation ..."

*Id.*, at 359–60, n. 18, 99 S.Ct. 2341–42, n. 18. The Court went on to state that "... appropriations ... 'have the limited and specific purpose of providing funds for authorized programs.'" *Id.*, at 360, 99 S.Ct. at 2342, *citing, TVA v. Hill*, 437 U.S. 153, 190, 98 S.Ct. 2279, 2298–2300, 57 L.Ed.2d 117 (1978). Moreover, "... the ... provisions of NEPA are directed precisely at the processes of 'planning and ... decisionmak-ing,' [and, therefore,] are associated with underlying legislation ..." *Id.* (citations omitted).

 Essentially, the distinction drawn between authorizing legislation and appropriations acts is that appropriations acts generally cannot serve as a vehicle of substantive legislation or as a ratification of prior agency action. *See City of Los Angeles v. Adams*, 556 F.2d 40, 48 (D.C.Cir. 1977); *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d at 354–55; *Sierra Club v. Froehlke*, 345 F.Supp. 440, 446 (W.D.Wis.1972), *aff'd*, 486 F.2d 946 (7th Cir.1973). As a general rule, appropriations acts do not affect substantive legislation. *See United States v. Vulte*, 233 U.S. 509, 514–15, 34 S.Ct. 664, 666, 58 L.Ed. 1071 (1914), and cannot be construed as implicit authorization of projects. *See, e.g., Greene v. McElroy*, 360 U.S. 474, 505, 79 S.Ct. 1400, 1418, 3 L.Ed.2d 1377 (1959); *D.C. Federation of Civic Associations v. Airis*, 391 F.2d 478, 481–82 (D.C.Cir.1968). However, "[c]ongressional approval or authorization may be found in ... appropriations statutes, so long as it is demonstrated that Congress had knowledge of the precise action or project at issue and was explicitly and specifically addressing that project." *Sierra Club v. Andrus*, 610 F.2d 581, 601 (9th Cir.1979), *rev'd on other grounds*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981).

 In essence, the resolution of the issue of whether an appropriations measure constitutes authorization depends on the factual background of each case. *See Libby Rod and Gun Club v. Poteat*, 594 F.2d 742 (9th Cir.1979). The Court, in reviewing the background of each case, must look to the legislative history to ascertain Congressional intent in determining whether the appropriations bill is authorization of the project. *See Sierra Club v. Andrus*, 610 F.2d at 602 (wherein the Court looked to the legislative history which reflected that Congress knew that a specific facility was a part of the project, thereby authorizing the facility in an appropriations bill). Further, any time an argument is made

that an appropriations bill is authorization, the committee reports should be closely scrutinized. *See Sierra Club v. Andrus, Id.* at 609, n. 1 (citations omitted) (Tang, J. concurring). For example, the Court should be "... hesitant, as was the Supreme Court in *TVA v. Hill,* to interpret isolated remarks in committee hearings or reports as expressions of the intent or knowledge of Congress." *Poteat,* 594 F.2d at 746. *See also Montgomery v. Ellis,* 364 F.Supp. 517, 532 n. 7 (N.D.Ala.1973) (wherein the Court observed that Congressional committees could not exercise legislative powers which were within the realm of Congress itself under the Constitution).

■ In the case at bar, Defendants contend that the 1983 and 1985 appropriations bills provide the necessary authorization for the Wallisville project, either explicitly in 1983 based on the Appropriations Committee report attached to the bill, and/or implicitly in 1985 based on the language referencing the NEPA documents.

While this Court acknowledges that the language contained in the Committee report to the 1983 Congressional action[40] reauthorizes as a matter of form the Wallisville project, even though fatally flawed by being based on the incomplete NEPA documents (EIS–PACR and SIPACR), the Court does not agree that the Senate and House Appropriations Committees' language referencing all of the NEPA documents in 1985 provides authorization for the project. A review of the legislative history of the 1985 bill does not indicate that the 1985 bill was intended as a reauthorization of Wallisville.

In sum, Congress, in 1983, authorized a project based on incomplete NEPA documents. Therefore, in 1983, Congress was not statutorily fully informed and could not make a well-considered decision as mandated by the very purpose of NEPA. Thereafter, in 1985, some nineteen months later, Congress attempted to rectify its mistake (the obtaining of fragmentary NEPA documentation by its own actions in violation of

its own statute) by claiming to be fully informed given the documents that had purportedly completed NEPA process between the 1983 Congressional authorization bill and the 1985 Congressional appropriations bill. However, after careful review of the applicable law, this Court holds that the 1985 appropriations act referencing the "completed" NEPA documents which enabled Congress to make a fully informed "decision" was not a substitution for the 1983 authorization, and did not remedy the fatal defect in the 1983 legislation. The 1985 appropriations act merely was funding for the Wallisville project that previously had been authorized in 1983 based on incomplete documentation that had not proceeded through the NEPA process. Therefore, the 1985 appropriations act did not authorize the Wallisville project based on the array of NEPA documentation referenced therein.

After careful review of the Committee hearings, there is no indication that the 1985 Congressional action was intended to be anything other than an appropriation of funds. The end result is that this Court is faced with a project that has been authorized by legislation (1983) which was based on inadequate NEPA documentation. This defect has never been corrected, and NEPA, accordingly, has never been satisfied.

## VIII.

### CONCLUSION

This Court recognizes only too well that protracted litigation in environmental cases can kill projects by delay. It has been thirteen years since this Court imposed the current injunction, and it certainly was anticipated when the most recent hearings commenced that the evidence would reflect a thorough and detailed NEPA review consistent with the dictates of the Fifth Circuit Court of Appeals. What has emerged instead is a tortuous, time consuming procedural record of the interaction of the Corps and Congress on Wallisville. It is replete

---

**40.** Vol. 1, pg. 21.

with instances of Corps' bad faith which flouts as well the environmental safeguards built into NEPA for Congress to adhere to in passing environmental legislation. These are not minor matters which can be excused on the grounds that to hold contrary to the Corps would be exalting form over substance. Indeed, they go to the very core and meaning of NEPA.

Another major concern of the Court is a prompt major resolution of this litigation pursuant to existing law so that there will be no further delay in the overall surface water availability for Houston and its environs as well as benefits for the other sponsors of the project. But the latest legal quagmire precludes any consideration of these matters until the law is properly applied. One wonders why, if the professed benefits of this project are so obvious, a simple course of action which complied with NEPA was not followed to the letter, thereby eliminating all of this fruitless waste of time and legal expense.

It takes but a moment's reflection to recognize the Court's dilemma in fashioning a course of action for the Corps to follow while the injunction remains in place.

With NEPA as a federal statute having been turned askew by virtue of aberrant Congressional action on Wallisville before the Corps' procedures had been completed, it may be exceedingly difficult for the Corps to commence anew and exercise its statutory good faith environmental investigative role without feeling totally intimidated by the Congress which has already made up its mind and legislated. Yet, the Court has no other choice. It cannot accept any of the Corps' positions heretofore analyzed in this opinion, since they are statutorily and legally untenable.

Therefore, the Corps will complete the full processing of the 1981 EIS–PACR, and will process the 1982 SIPACR through all aspects of the NEPA administrative review including the obtaining of agency and individual input so that a bona fide record of decision ultimately can be presented to the Congress for its consideration. In brief, the Corps will re-commence the administrative process at the time when the first departure from standard NEPA procedures occurred prior to the 1983 legislative action. In the interim, the injunction will remain in place pending full compliance by the Corps with NEPA.

EXHIBIT A

CHRONOLOGY

| | |
|---|---|
| 1962 | Congress authorizes construction of 19,700 acre Wallisville Lake Project. PL 87–874. |
| 1966 | Corps commences construction of Wallisville project. |
| 1969 | Congress passes NEPA |
| 1970 | Corps circulates a draft Environmental Impact Statement (EIS) for the Wallisville project. |
| 1971 | Sierra Club files suit to enjoin project. CA 71–H–983. |
| 1973 | District Court enjoins construction of project in a summary judgment. |
| 1974 | Fifth Circuit reverses and remands decision of trial court but injunction remains intact pending supplemental study. |
| 1974–79 | Corps undertakes reevaluation studies and proposes modifications to the project. |
| July 1979 | Corps circulates draft Post-Authorization Change Report (PACR) and EIS that recommends the modified 5,600 acre project. |
| July 1981 | Corps circulates draft final PACR and EIS. |
| October 1981 | PACR and EIS forwarded to Board of Engineers for Rivers and Harbors (BERH) for comment. |

| | |
|---|---|
| March 1982 | BERH sends PACR and EIS to Office of Chief of Engineers (OCE) for resolution of policy issues. |
| March 1982 | OCE requests Galveston Division to prepare supplemental information to resolve policy issues raised by BERH. |
| July 1982 | Galveston District (Corps) prepares an internal document entitled Supplemental Information to Post-Authorization Change Report (SIPACR) and submits it to OCE. |
| July 1983 | Congress reauthorizes modified Wallisville project, relying in part on SIPACR. |
| Sept. 1983 | SIPACR attached to PACR and released to the public and interested agencies for review and comment. |
| Feb. 1984 | Corps prepares Supplemental Information Report (SIR) including the Corps' responses to comments on the final EIS and SIPACR. |
| Feb. 25, 1984 | General Dacey signs Record of Decision (ROD) approving the Wallisville project. |
| Nov. 1985 | Congress again appropriates funds on the Wallisville project after reviewing all of the Wallisville project documents including the SIR and ROD. |

EXHIBIT B